## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| [ANONYMOUS], | ) |
| | ) Civil Action No.: |
| Plaintiffs, | ) |
| | ) **FILED IN CAMERA AND UNDER** |
| v. | ) **SEAL IN ACCORDANCE WITH** |
| | ) **THE FALSE CLAIMS ACT 31 U.S.C.** |
| [ANONYMOUS], | ) **§ 3730(b)(2)** |
| | ) |
| Defendant. | ) **DO NOT PLACE IN PRESS BOX** |
| | ) |
| | ) **DO NOT ENTER ON PACER** |
| | ) |
| | ) **JURY TRIAL DEMANDED** |
| | ) |
| | ) |

## **COMPLAINT**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE UNITED STATES OF AMERICA, ex rel. KENNETH COTE and JOHN FERGUSON, | ) |
| | ) Civil Action No.: |
| | ) |
| Plaintiffs, | ) **FILED IN CAMERA AND UNDER** |
| | ) **SEAL IN ACCORDANCE WITH** |
| v. | ) **THE FALSE CLAIMS ACT 31 U.S.C.** |
| | ) **§ 3730(b)(2)** |
| CITIZENS BANK, N.A., | ) |
| | ) **DO NOT PLACE IN PRESS BOX** |
| Defendant. | ) |
| | ) **DO NOT ENTER ON PACER** |
| | ) |
| | ) **JURY TRIAL DEMANDED** |
| | ) |
| | ) |

## **COMPLAINT**

The United States of America, through plaintiff-relators Kenneth Cote and John Ferguson ("Relators"), bring this action against defendant Citizens Bank, N.A. ("Citizens Bank") pursuant to the federal False Claims Act.

## I.      NATURE OF THIS ACTION

1.      This action is brought against defendant Citizens Bank to recover money that the federal government paid to Citizens Bank and others as a result of the submission of false claims arising from Citizen Bank's residential mortgage business.

2.      Beginning no later than 2012 and continuing through the present, Citizens Bank has subordinated its real estate appraisal function to the profit demands of its mortgage origination business in violation of federal regulations and its own company policies.  Despite the lessons ostensibly learned from the Financial Crisis, Citizens Bank has continued to originate mortgages based on illegal practices that both undermine the federal government's regulation of the housing industry and defraud federal agencies of likely hundreds of millions of dollars.

3.      Citizens Bank is and has been a participant in the Federal Housing Administration's Direct Endorsement Lender program, in which banks are authorized to originate FHA-insured mortgage loans without pre-approval of individual loans by the government.  In exchange for this authorization, Direct Endorsement Lenders are subject to strict underwriting and appraisal requirements when originating FHA-insured loans.  Among these requirements is that the lender maintain an appraisal process that has integrity and is free from pressure or interference by the business side of the bank.

4.      Citizens Bank also originates residential mortgage loans that it sells to the government-sponsored enterprises Freddie Mac and Fannie Mae.  When banks sell mortgage loans to the GSEs, they are subject to appraisal-related requirements that are similar to those applicable to

1

FHA-insured mortgages – namely, that the appraisers act independently of the origination business.

5.       In violation of these federal requirements, Citizens Bank originated FHA-insured mortgages using an appraisal process in which senior appraisal executives took direction from business heads and permitted loan officers and other loan production employees to exert continuous pressure on the appraisal group to inflate home values in order to sell more loans. When Direct Endorsement Lenders originate FHA-insured mortgages with artificially inflated appraised values, they cause the FHA to incur default risk and ultimately financial losses that it would not suffer if the subject properties were properly appraised.

6.       This same flawed appraisal process was used in the origination of mortgage loans that were sold to the GSEs.  When mortgage lenders sell mortgages based on inflated home values to the GSEs, the government is made to pay for loans that do not meet federal requirements or that involve greater risk than is disclosed to them at the point of sale.

7.        Citizens Bank has originated hundreds of millions of dollars in FHA-insured mortgage loans and has sold billions of dollars of mortgage loans to the GSEs in recent years.  The process by which Citizens Bank appraised the collateral for these loans was fatally flawed and operated in violation of federal requirements, resulting in substantial financial damages to the federal government.

## II.    JURISDICTION AND VENUE

8.       This Court has jurisdiction under 31 U.S.C. §§ 3730 *et seq.* and 28 U.S.C. §§ 1331 and 1345.  The Court may exercise personal jurisdiction over the defendant because it resides and/or transacts business in this District or committed the proscribed acts in this District.

9.      Venue lies in this District pursuant to 31 U.S.C. § 3732(a), in that many of the acts complained of took place in this District and the defendant is located in this District.

### III.      PARTIES

10.     The United States of America is the real party in interest to the claims of this action.

11.     The United States brings this action on behalf of the Department of Housing and Urban Development ("HUD"), which oversees the Federal Housing Authority ("FHA"), and on behalf of the Federal Housing Finance Agency ("FHFA"), which is the successor to the claims of, by way of conservatorship, the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," and together with Fannie Mae, the "GSEs").

12.     Relator Kenneth Cote resides in Rhode Island.  He is a Certified General Appraiser with extensive knowledge and experience in regulatory appraisal processes, appraisal review, and credit risk valuation policies and procedures.  Mr. Cote has experience in appraising residential and commercial properties for banks, mortgage companies, and other individuals and entities.

13.     Mr. Cote worked at Citizens Bank from 2003 until October 2014, beginning as a Real Estate Appraisal Review Manager, then Assistant Vice President-Manager of Appraisal Review & Vendor Services, and ultimately becoming the Chief Residential Appraiser of the bank. As Chief Appraiser, Mr. Cote was responsible for management and control of all appraisal functions for the Credit Risk Management and Home Lending Solutions divisions.

14.     Mr. Cote is a certified appraiser in Rhode Island, Connecticut, Massachusetts, New York and Maryland, and is certified by the National Association of Review Appraisers and Mortgage Underwriters.  He served as a member of the Rhode Island State Appraiser's Board from 2009-2014, being appointed by two separate Governors and served as the Chairman of that Board from 2011 to 2012.

15.     Relator John Ferguson resides in California.  He is a Certified Real Estate Appraiser and a Certified General Appraiser.  He currently owns and operates his own appraisal firm, Ferguson Consulting, which, *inter alia*, provides consulting services on residential appraisals, fraud detection, post close forensic reviews, loss mitigation, origination fraud detection, and Fannie Mae/Freddie Mac compliance.

16.     Mr. Ferguson also was a Collateral Asset Manager for Federal Home Loan Bank of San Francisco (FHLBSF).  Prior to that, Mr. Ferguson was in charge of Business Development, Target Marketing, and Financial Institution Member Education for FHLBSF.

17.     Mr. Ferguson has several certificates and licenses recognized by the appraisal industry, and he previously worked as a bank appraiser and as a forensic appraiser for Fannie Mae.  Mr. Ferguson has more than 25 years of experience in the real estate valuation industry.  Mr. Ferguson has also consulted on books and magazine articles, and is a speaker at appraisal expos. He has also worked with the New York Attorney General's Office on appraisal issues.

18.     From 1998 to 2014, defendant Citizens Bank, N.A. was an operating subsidiary of the Royal Bank of Scotland ("RBS")[1], called RBS Citizens, N.A.[2]

---

[1] "The Royal Bank of Scotland Group plc is the holding company of a large global banking and financial services group. Headquartered in Edinburgh, the Group operates in the United Kingdom, the United States and internationally through its principal subsidiaries, the Royal Bank and NatWest. Both the Royal Bank and NatWest are major UK clearing banks. In the United States, the Group's subsidiary RBS Citizens is a large commercial banking organisation. Globally, the Group has a diversified customer base and provides a wide range of products and services to personal, commercial and large corporate and institutional customers."  RBS 2013 Form 20-F, at 106.

[2] This complaint refers to both Citizens Bank, N.A. and RBS Citizens, N.A. as "Citizens Bank."

19. Citizens Bank has been engaged in the residential mortgage business at all times relevant to this action. RBS stated in its 2013 Annual Report that:

> RBS Citizens residential real estate portfolio was £19.6 billion at 31 December 2013 (2012 - £21.5 billion). The Core business comprised 91% of the portfolio. The real estate portfolio consisted of £5.9 billion (£5.6 billion Core vs. £0.3 billion Non-Core) of first lien residential mortgages (1% in second lien position) and £13.5 billion (£12 .0 billion Core vs. £1.5 billion Non-Core) of home equity loans and lines (first and second liens).

RBS 2013 Form 20-F at 255.

20. Citizens Bank has been a Direct Endorsement Lender at all times relevant to this action.

21. As part of its residential mortgage business, Citizens Bank sold mortgage loans to the GSEs:

> …RBS Citizens is an originator and servicer of residential mortgages, and it routinely sells such mortgage loans in the secondary market and to GSEs. In the context of such sales, RBS Citizens makes certain representations and warranties regarding the characteristics of the underlying loans and, as a result, may be contractually required to repurchase such loans or indemnify certain parties against losses for certain breaches of the representations and warranties concerning the underlying loans.

RBS 2013 Form 20-F, at 473.

22. In September 2014, RBS initiated the public sale of Citizens Bank through an initial public offering, creating the public company Citizens Financial Group, Inc. (CFG: NYSE).

23. "Following three subsequent follow on equity offerings in March, July, and November of 2015, Citizens is now fully separated from RBS." CFG Form 2015 10-K, at 5.

24. "CFG is a bank holding company under the Bank Holding Company Act of 1956." CFG Form 2015 10-K, at 14. "Headquartered in Providence, Rhode Island, with $138.2 billion of total assets as of December 31, 2015, [it is] the 13th largest retail bank holding company in the United States." CFG Form 2015 10-K, at 5.

25.    CFG operates its bank business primarily through Citizens Bank and another, much

smaller, subsidiary:  "Our primary subsidiaries are CBNA, a national banking association whose

primary federal regulator is the OCC, and CBPA, a Pennsylvania-chartered savings bank

regulated by the Department of Banking of the Commonwealth of Pennsylvania and supervised

by the FDIC as its primary federal regulator."  CFG Form 2015 10-K, at 5.

26.    Citizens Bank has common equity tier 1 capital for Basel III purposes reported at over

$10 billion and risk-weighted assets of over $91 billion.  CFG 2015 10-K, at 88 (In contrast,

CBPA had $3 billion in common equity tier 1 capital and $23 billion in risk-weighted assets).

27.    Citizens Bank originates FHA-insured loans as a "Direct Endorsement Lender" and may

sell such loans or retain them on its balance sheet.[3]  FHA-insured loans that defendant retains on

its balance sheet are disclosed on a consolidated basis as part of CFG's Basel III reporting

obligations.  CFG disclosed $394 million in loans guaranteed by FHA as of the fourth quarter of

2015:

---

[3]  Citizens Bank website, "VA Loans, FHA Loans & Other Federal Mortgage Programs," available at https://www.citizensbank.com/loans/va-and-fha-loan.aspx (last visited Apr. 19, 2016).

| Total Exposure Covered by Guarantees and Associated RWA | | | |
|---|---|---|---|
| (dollars in millions) | As of December 31, 2015 | | |
| Guarantor | Guaranteed Exposure Amount | RWA | RW % |
| FNMA & FHLMC securities | $10,249 | $2,050 | 20% |
| Federal Housing Administration (FHA) | 394 | 79 | 20 |
| FNMA | 166 | 33 | 20 |
| Small Business Administration (SBA) | 97 | 20 | 20 |
| Federal Family Education Loan Program (FFELP) where 97% of exposure is guaranteed | 77 | 15 | 20 |
| Federal Family Education Loan Program (FFELP) where 98% of exposure is guaranteed | 26 | 5 | 20 |
| Veteran Affairs (VA) | 10 | 2 | 20 |
| Total | $11,019 | $2,204 | 20% |
| | | | |
| US Treasury & GNMA securities | $11,104 | $— | 0% |
| Export/Import | 18 | — | 0 |
| Total | $11,122 | $— | 0% |

Citizens Financial Group, Inc., Dec. 31, 2015 Basel III Disclosures, at 20.

28.     Defendant Citizens Bank has continued to originate and sell mortgages to the GSEs as

part of CFG:

> In its mortgage banking business, the Company sells residential mortgages to government-sponsored entities and other parties, who may issue securities backed by pools of such loans. The Company retains no beneficial interests in these sales, but may retain the servicing rights of the loans sold. The Company is obligated to subsequently repurchase a loan if the purchaser discovers a standard representation or warranty violation such as noncompliance with eligibility requirements, customer fraud, or servicing violations. This primarily occurs during a loan file review. The Company received $2.7 billion, $1.6 billion, and $4.2 billion of proceeds from the sale of residential mortgages for the years ended December 31, 2015, 2014 and 2013, respectively, and recognized gains on such sales of $51 million, $36 million, and $66 million for the years ended December 31, 2015, 2014 and 2013, respectively. Pursuant to the standard representations and warranties obligations discussed in the preceding paragraph, the Company repurchased residential mortgage loans totaling $10 million, $25 million, and $35 million for the years ended December 31, 2015, 2014 and 2013, respectively.

CFG Form 2015 10-K at 160.

29.     Citizens Bank's residential mortgage business has been highly profitable to CFG.  The Consumer Banking segment, of which residential mortgages are a material component, generated $262 million in net income in 2015.

## IV.     THE FALSE CLAIMS ACT

30.     The False Claims Act ("FCA") provides in pertinent part that any person who:

>       (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

>       (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

>                               ***

>       (G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government [for treble damages and such penalties as are allowed by law].

 31 U.S.C. § 3729(a)(1)(A), (B) and (G).

31.     The FCA further provides that "knowing" and "knowingly"

>       (A)     mean that a person, with respect to information-

>               (i)     has actual knowledge of the information;

>               (ii)    acts in deliberate ignorance of the truth or falsity of the information; or

(iii)     acts in reckless disregard of the truth or falsity of the information; and

(B)     require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

32.     An "obligation," as that term is used in 31 U.S.C. § 3729(a)(1)(G), includes "the retention of any overpayment."  31 U.S.C. § 3729(b)(3).

33.     Effective May 20, 2009, the False Claims Act defines the term "claim" to mean, in relevant part:  "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A) (2010).

34.     The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act.  *See U.S. v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

35.     Section 3729(a)(1) of the FCA provides that a person is liable to the United States for three times the amount of damages which the Government sustains because of the act of that person, plus, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, a civil penalty of $5,500 to $11,000 per violation.

## V.     THE FHA'S MORTGAGE INSURANCE PROGRAM

**A.     FHA Relies On Direct Endorsement Lenders To Comply With Their Fiduciary Obligations When Originating FHA-Insured Mortgages**

36.     HUD is a cabinet-level agency of the United States.  Its mission is to create strong, sustainable, inclusive communities and quality affordable homes for all.  HUD works to strengthen the housing market to bolster the economy and protect consumers, meet the need for quality affordable rental homes, utilize housing as a platform for improving quality of life, and build inclusive and sustainable communities free from discrimination.

37.     FHA is part of HUD and is one of the largest mortgage insurers in the world.  Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured more than 40 million home loans since FHA's inception.  Through some of these mortgage insurance programs, FHA provides insurance against losses on mortgage loans to single family home buyers originated and held by approved lenders, or mortgagees.

38.     If a homeowner defaults on an FHA-insured mortgage, the holder of the mortgage may submit a claim to HUD.  HUD will then pay the mortgage holder the outstanding balance on the loan and other costs associated with the default.  The mortgage holder therefore suffers no loss when a borrower is unable to repay an FHA-insured mortgage.  This no-loss guarantee encourages lenders to make loans to creditworthy applicants who would otherwise have difficulty qualifying for conventionally available financing on favorable terms, including the ability to put little money down to make the purchase.  FHA mortgage insurance programs therefore help many creditworthy low- and medium-income families as well as first-time homebuyers become homeowners.

39.     A lender must apply to be a Direct Endorsement Lender and must be approved by HUD to underwrite FHA-insured mortgage loans on HUD's behalf.  This is an important responsibility

because HUD "does not review applications for mortgage insurance before the mortgage is executed." 24 C.F.R. § 203.5(a).  Instead, the Direct Endorsement Lender underwrites mortgage loans on HUD's behalf and determines whether a borrower presents an acceptable credit risk for HUD.  In underwriting the mortgage loan, the lender must determine whether the borrower and the mortgage loan meet HUD's requirements for FHA insurance and whether the "proposed mortgage is eligible for insurance under the applicable program regulations."  *Id*.  The Direct Endorsement Lender must decide whether or not to approve the borrower for an FHA-insured mortgage loan.

40.     After the Direct Endorsement Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA insurance, meaning that the mortgage loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan.  The Direct Endorsement Lender must certify that the loan meets all of HUD's requirements and HUD relies on this certification to endorse the loan for FHA insurance.

41.     Certain Direct Endorsement Lenders apply to, and participate in, the Lender Insurance program in which the mortgagees themselves endorse the mortgage for FHA insurance and retain all documentation supporting the mortgage.  24 C.F.R. § 203.6.  The lender retains the documents necessary to approve the loan (the FHA "case binder") and remits the documents to HUD only upon request.  *See* Mortgagee Letter 2005-36.

42.     A Direct Endorsement Lender is expected and obligated to act with the utmost good faith, honesty, and fairness in its dealings with HUD.  "Under the … civil case law the mortgagee, knowing that the federal insurer is 'relying on its professional judgment in a business relationship' has an affirmative duty 'to use due care in providing information and advice' to the

11

federal mortgage guarantor." *United States v. Bernstein*, 533 F.2d 775, 797 (2d Cir. 1976)

(citing *1st Nat'l Bank, Henrietta v. Small Bus. Admin.*, 429 F.2d 280, 287 (5th Cir. 1970); *Mt. Vernon Coop. Bank v. Gleason*, 367 F.2d 289, 293 (1st Cir. 1966)).  As a result, in addition to

the regulatory duties addressed below, the Direct Endorsement Lender owes both a fiduciary

duty and a duty of reasonable care to HUD.

**B.     Lenders Must Submit Truthful Certifications To HUD**

43.     The success of the Direct Endorsement Program depends upon proper underwriting of

loan files.  Participating lenders have to determine the eligibility of borrowers and loans for FHA

insurance, and ensure the integrity of the data relied upon to make such determinations.

44.     Under the Direct Endorsement Program, HUD relies on the expertise and knowledge of

the lenders.

45.     HUD also relies on the truthfulness of the certification the lender completes on each loan

certifying that the loan is eligible for FHA insurance.  As HUD has explained, these

"certifications are important as HUD will rely upon them for purposes of endorsing the mortgage

loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to

endorsement."  Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct

Endorsement Processing, 48 Fed. Reg. 11928, 11932 (March 22, 1983).

46.     HUD requires Direct Endorsement Lenders to certify their compliance with the foregoing

due diligence, quality control, and reporting requirements.

47.     First, when a lender applies to participate in the Direct Endorsement Lender program and

to endorse loans for FHA insurance on HUD's behalf, the lender must certify that it will fully

comply with all HUD guidelines, regulations, and requirements:

> I certify that, upon the submission of this application, and with its submission of
> each loan for insurance or request for insurance benefits, the applicant has and

> will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to, the National Housing Act (12 U.S.C. § 1702 *et seq.*) and HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies with regard to using and maintaining its FHA lender approval.

This certification is submitted to HUD headquarters in the District of Columbia.

48.    If the lender is approved, the lender must re-certify, every year, that it is complying with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan.  Since 2010, lenders must certify:

> I certify that I know, or am in the position to know, whether the operations of above-named lender conform to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies; and that I am authorized to execute this report on behalf of the lender.  I certify that the lender complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies and terms of any agreements entered into with [HUD].  I certify that to the best of my knowledge, the above-named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named lender is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for above-named lender …. Each of my certifications is true and accurate to the best of my knowledge and belief.  I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

These certifications are submitted to HUD headquarters in the District of Columbia.

49.     Unless the lender submits a truthful initial certification and annual certifications, the lender is not entitled to obtain or maintain its status as a Direct Endorsement Lender or to endorse loans for FHA insurance.

50.    In addition, for each individual mortgage loan approved for FHA insurance, the lender must make a "loan-level" certification—*i.e.*, a certification specific to an individual loan—that

the individual mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program."  Form HUD-92900-A.[4]

51.     The "loan-level" certification differs depending on whether the lender used an Automated Underwriting System ("AUS") or manual underwriting.  For each loan that was underwritten with an AUS, the lender must certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)."  *Id.*  For each loan that required manual underwriting, the lender must certify that the Direct Endorsement Underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage."  *Id.*

52.     For all loans, the mortgagee's representative must certify:  "I, the undersigned, as authorized representative of mortgagee at this time of closing this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents.  I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4."[5]  *Id.*  If the loan does not meet all applicable HUD requirements, it is not eligible for FHA insurance and cannot be certified for endorsement.

53.     Absent the applicable certifications for an individual loan as described herein, the Direct Endorsement Lender cannot endorse that loan for FHA insurance.

---

[4] HUD recently finalized an updated Form HUD 92900-A that will be effective starting August 1, 2016.  Mortgagee Letter 2016-06.  This updated form similarly requires the lender to certify compliance with applicable HUD regulations.

[5] As of May 9, 2009, HUD Handbook 4000.4 was superseded by HUD Handbooks 4155.1 and 4155.2.  HUD Handbook 4155.1 was superseded by HUD Handbook 4000.1 on March 16, 2016.

54.     Each of the foregoing certifications is material to HUD's payment of any claim submitted under the Direct Endorsement Lender Program.  HUD does not review FHA loans for approval prior to the loan being endorsed for insurance or to paying claims in the event of a default; instead, it relies on its lenders to comply with HUD requirements and to ensure that every loan is in fact eligible for FHA insurance.  The certifications are required for each lender to enter and remain in the program.  The certifications are critical to HUD's ability to ensure that only qualified and eligible loans are endorsed for HUD insurance.  The certifications are essential for a claim on a loan to be submitted for FHA insurance.  And the certifications are needed to protect HUD and the FHA insurance fund from undue risk and loss.

## C.     Lenders Must Perform Proper Due Diligence And Maintain The Independence Of Their Appraisal Function

55.      A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage.  That responsibility includes performing due diligence and ensuring accuracy.

56.     Proper due diligence is a critical component of the Direct Endorsement Program.  It is required by federal regulation and HUD Handbooks.  It is also require by virtue of the fiduciary duty and duty of reasonable care that the Direct Endorsement Lenders owe to HUD.  *See* 48 Fed. Reg. at 11932 ("The duty of due diligence owed [HUD] by approved mortgagees is based not only on these regulatory requirements, but also on civil case law.").  "The entire scheme of FHA mortgage guarantees presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found." *Bernstein*, 533 F.2d at 797.

57.     A lender's due diligence should (1) "determine a borrower's ability and willingness to repay a mortgage debt to limit the probability of default and collection actions," and (2)

15

"examine the property offered as security to determine if it is sufficient collateral."  HUD

Handbook 4155.1, ch. 1.A.1.a.  Proper due diligence thus requires an evaluation of, among other

things, a borrower's credit history, capacity to pay, cash to close, and collateral.  *Id.* at ch.

1.A.1.b.

58.     In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal

regulation, to "exercise the same level of care which it would exercise in obtaining and verifying

information for a loan in which the mortgagee would be entirely dependent on the property as

security to protect its investment."  24 C.F.R. § 203.5(c).

59.     HUD has established specific rules for due diligence predicated on sound underwriting

principles.  In particular, HUD requires Direct Endorsement Lenders to be familiar and to fully

comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed

instructions and requirements for Direct Endorsement Lenders.  These requirements set forth

"the minimum standard of due diligence in underwriting mortgages" with which Direct

Endorsement Lenders must comply.  *Id.*

60.     HUD considers the Direct Endorsement underwriter to be "the focal point of the Direct

Endorsement program."  HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C.  The Direct

Endorsement underwriter must assume the following responsibilities:

> Compliance with HUD instructions, the coordination of all phases of underwriting, and
> the quality of decisions made under the program;

> The review of appraisal reports, compliance inspections and credit analyses performed by
> fee and staff personnel to ensure reasonable conclusions, sound reports and compliance
> with HUD requirements;

> The decisions relating to the acceptability of the appraisal, the inspections, the buyer[']s
> capacity to repay the mortgage and the overall acceptability of the mortgage loan for
> HUD insurance;

The monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program; and

Awareness of the warning signs that may indicate irregularities, and an ability to detect fraud, as well as the responsibility that underwriting decisions are performed with due diligence in a prudent manner.

*Id.*[6]

61.   The underwriter must "evaluate the mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d).

62.   In addition, the mortgagee must "have the property appraised in accordance with [the] standards and requirements" prescribed by HUD.  *Id.* at § 203.5(e).  "The mortgagee's underwriter is to review the appraisal to determine whether or not the appraiser's conclusions are acceptable.  If found to be acceptable, the property is eligible for HUD mortgage insurance." HUD Handbook 4000.4, REV-1, CHG-2, ch. 3-3.G; *see also* HUD Handbook 4155.2, ch. 4.1.b (May 9, 2009) ("Lenders are responsible for properly reviewing appraisals and determining if the appraised value used to determine the mortgage amount is accurate and adequately supports the value conclusion.").  The underwriter's review includes verification, as possible, that the factual information submitted is correctly reported, as well as determination of the plausibility and consistency of the conclusions based on the data presented in the appraisal.  *See* HUD Handbook 4000.4, REV-1, CHG-2, ch. 3-3.G.

---

[6] *See* HUD Handbook 4155.2, ch. 2, Sections A.3 and A.4. (May 9, 2009).

63.     The appraisal must include the appraiser's certification that, among other things, the appraisal was not based on a requested minimum value or a specific value.  HUD Handbook 4150.2, CHG-1, ch. 5-1.A.[7]

64.     A Direct Endorsement Lender "must accept responsibility, equally with the appraiser, for the integrity, accuracy, and thoroughness of the appraisal, and will be held accountable by HUD for the quality of the appraisal."  Mortgagee Letter 1994-54.

65.     The appraisal is a critical component of the eligibility of a loan for FHA insurance because HUD places limits on the eligible loan amount based on the appraised value of the property.  The maximum eligible loan amount is determined by HUD's loan-to-value (LTV) limits, which compare the loan to the appraised value.

66.     FHA rules specifically provide that an appraisal cannot be "based on a requested minimum valuation, a specific valuation or range of values."  *See* Mortgagee Letter 1996-26. Appraiser independence from lenders has been a significant concern of the FHA, and as HUD reaffirmed in 2009, lenders are prohibited from providing to the appraiser "an anticipated, estimated, encouraged or desired value."  *See* Mortgagee Letter 2009-28.[8]

67.     In fact, "FHA has long advised lenders and appraisers of the importance of appraiser independence in the context of generally accepted prudent lending practices."  Mortgagee Letter 2009-28.

68.     The FHA required lenders to avoid not only conflicts of interest but even the appearance of conflicts of interest in Mortgagee Letter 2009-28:  "In order to help appraisers avoid conflicts or the appearance of conflicts, no members of a lender's loan production staff or any person (i) who is compensated on a commission basis upon the successful completion of a loan or (ii) who

[7] HUD Handbook 4150.2 was superseded by HUD Handbook 4000.1 (Mar. 16, 2016).

[8] Mortgagee Letter 2009-28 was superseded by HUD Handbook 4000.1 (Mar. 16, 2016).

reports, ultimately, to any officer of the lender not independent of the loan production staff and process, shall have substantive communications with an appraiser relating to or having an impact on valuation, including ordering or managing an appraisal assignment."

69.     Only the Direct Endorsement Underwriter, "who has responsibility for the quality of the appraisal report is allowed to request clarifications and discuss with the appraiser components of the appraisal that influence its quality." *Id*.

70.     Lenders are also prohibited from giving an appraiser anything of value in consideration of returning the appraisal at a given value, including the continued use of that appraiser. Mortgagee Letter 1996-26; 1997-45.[9]

**D.     Defaulted Loans Result In Losses To HUD**

71.     Once a loan is endorsed by HUD or the Direct Endorsement Lender, it is insured by FHA on the basis that the Direct Endorsement Lender has followed the HUD requirements and has submitted accurate certifications and that the loan is eligible for FHA insurance.  Without those requirements being met, the lender could not endorse the loan for FHA insurance.  It is only because a lender endorses a loan for FHA insurance that the holder of the mortgage is able to submit a claim to HUD for any losses.

72.     If the borrower defaults, the holder of the mortgage can submit a claim to HUD for any loss from the default.  The holder submits a claim for insurance by using HUD's electronic claim system.  The claim must include certain information.  Each loan that is endorsed for FHA insurance has a unique FHA case number, and the claim must include the FHA case number.  If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim.  The claim also must include the identification number of the mortgagee

---

[9] Mortgagee Letter 1997-45 was superseded by HUD Handbook 4000.1 (Mar. 16, 2016).

inputting the claim, which must be either the holder of record or the servicer of record of the mortgage.

73.     FHA pays these insurance claims in two parts.  First, the mortgage holder makes an initial claim for the unpaid principal on the loan, plus interest.  Second, if applicable, the mortgage holder later makes a final claim for expenses and allowances (*i.e.*, foreclosure costs), plus interest.  HUD Handbook 4330.4, REV-1, ch. 2-4.

74.     These claims are submitted to HUD electronically, and HUD's electronic system processes them automatically.  The system ensures that the FHA insurance is active with respect to the FHA case number provided and that there are no other impediments (such as a no-pay flag or indemnification agreement) to paying the claim.  After processing, the claim is approved for payment, and a disbursement request is sent to the United States Treasury to issue the funds via wire transfer to the holder of the mortgage note.

**E.      Direct Endorsement Lenders Owe Duties To HUD By Virtue Of Their Authority To Endorse Loans For FHA Insurance And Their Responsibility To Ensure Accuracy**

75.     HUD grants Direct Endorsement Lenders responsibility for determining which loans qualify for FHA insurance.  In granting this control and responsibility to the Direct Endorsement Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge, good faith, integrity, and candor.  HUD therefore enters into a fiduciary relationship with the Direct Endorsement Lenders.

76.     As a result of this fiduciary relationship, the Direct Endorsement Lenders owe HUD a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with HUD.  These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of HUD when endorsing loans for FHA insurance, reviewing the loans for quality control purposes, reporting defective loans, and submitting claims.

## VI.     THE GSE SINGLE FAMILY MORTGAGE GUARANTEE PROGRAM

77.     Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets.  As part of this mission, Fannie Mae and Freddie Mac purchase single-family residential mortgages from lenders.

78.     The Federal Housing Finance Agency ("FHFA") was created on July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617), to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  On September 6, 2008, pursuant to HERA, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorships and appointed FHFA as conservator. In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs. 12 U.S.C. § 4617(b)(2).

79.     Simultaneous with the placement of Fannie Mae and Freddie Mac into conservatorships, the United States Department of Treasury ("Treasury") exercised its authority under HERA "to purchase any obligations and other securities" issued by the GSEs and began to purchase preferred stock pursuant to the Senior Preferred Stock Purchase Agreements ("PSPAs"). Treasury has since provided over $100 billion in support to the GSEs under the PSPAs.

80.     In their single family business line, GSEs buy single-family mortgages from mortgage companies and other financial institutions in order to provide liquidity to the mortgage market. The GSEs then either hold the loans in their investment portfolios or bundle them into mortgage-backed securities that they sell to investors.

81.     The GSEs derive revenue in their single family business line primarily from "guarantee fees," *i.e.*, fees received as compensation for guaranteeing the timely payment of principal and interest on mortgage loans pooled into mortgage-backed securities.

82.     The GSEs' single family mortgage business primarily acquires loans through one of two channels:  (i) the lender (or flow) channel, which obtains loans from lenders on a going-forward basis pursuant to agreements to purchase loans prior to their origination; and (ii) the investor (or bulk) channel, which acquires groups of loans that have already been originated based on certain data about the loans that the GSEs review prior to purchase.

83.     In purchasing loans, GSEs rely on lenders' representations and warranties that their loans comply in all respects with the standards outlined in the GSE selling guides and lender sales contracts, which set forth underwriting, documentation, quality control, and self-reporting requirements.  Specifically, loans sold to Fannie Mae must comply with its Single Family Selling Guide and purchase contracts.  Loans sold to Freddie Mac must comply with its Single Family Seller/Servicer Guide and purchase contracts.

84.     The Fannie Mae Selling Guide explicitly provides that "unacceptable appraisal practices" include reporting market value that is not supportable by market data or is misleading; development of an appraisal in a manner or direction that favors the cause of either the client or any related party, the amount of the opinion of value, the attainment of a specific result, or the occurrence of a subsequent event in order to receive compensation or employment for performing the appraisal or in anticipation of receiving future assignments; and development of or reporting an appraisal in a manner that is inconsistent with the requirements of the USPAP. *See* FNMA Selling Guide, Section B4-1.104 ("Unacceptable Appraisal Practices"), updated Apr. 15, 2014.

85.     Freddie Mac's Seller Guide contains similar requirements for appraisals and appraiser independence.  *See* Freddie Mac Single Family Seller Guide, Section 5601.3, updated March 2, 2016 ("Freddie Mac's requirements are supplemental to those of USPAP …. The Seller must ensure that the individuals ordering and underwriting appraisal reports and performing collateral reviews are independent of loan production staff.")

86.     The purchase contracts between a GSE and a lender include both a long-term master agreement that supplements the relevant selling guide and short-term contracts that grant variances or waivers from the selling guide requirements to permit a lender to sell a specific loan product.  The GSEs typically negotiate such variances on an annual basis based on the performance of the applicable loan product and other factors, and may decide to adjust the pricing on the affected loans for the following year or eliminate the variance altogether.

87.     The lenders' representations that they are underwriting and delivering investment-quality mortgages according to the GSEs selling guide and contractual requirements are material to the GSEs' decisions to purchase mortgage loans.  Such representations attest to the credit quality of their loans at the time of sale, the borrower's ability to repay the loan, and the accuracy of the loan data provided.  Among the most basic requirements of an investment quality mortgage are that:  (i) all required loan data is true, correct, and complete; (ii) automated underwriting conditions are met for loans processed through an automated underwriting system; and (iii) no fraud or material misrepresentation has been committed by any party, including the borrower. These requirements were in effect during the relevant time period and remain in effect today.

88.     A lender must also represent and warrant that its quality control department takes certain post-closing measures intended to detect problems with loan manufacturing quality, including: (i) reviewing data integrity within automated underwriting systems; (ii) re-verifying underwriting

decision and documents; (iii) re-verifying fieldwork documents (including as to appraisal and title); (iv) reviewing closing and legal documents; and (v) conducting regular reviews of internal controls relating to loan manufacturing quality and fraud prevention.  These requirements were also in effect during the relevant time period and remain in effect today.

89.     When a GSE identifies a material breach of a warranty, usually during a post-default quality review of a loan, it may demand that the lender repurchase the loan and/or reimburse the GSE for any loss already incurred.  Where a lender identifies a material breach of a selling warranty on its own, it must self-report the loan to the GSE.

## VII.   FACTUAL ALLEGATIONS

### A.   Citizens Bank Directly Endorsed FHA-Insured Mortgage Loans, Which Upon Default Require FHA To Pay Substantial Insurance Claims

90.     Citizens Bank has participated in the FHA Direct Endorsement Lender Program and in the Lender Insurance Program throughout the relevant time period.

91.     After endorsing a mortgage loan for FHA insurance, Citizens Bank typically sold that loan to large institutional investors located throughout the United States.  Citizens Bank and its investors considered FHA-insured loans to be less risky because the holder of the mortgage would be made whole by FHA in the event of a default.

92.     Citizens Bank profited both by charging loan fees and by selling the FHA-insured loans.

93.     Loans endorsed for FHA insurance by Citizens Bank during the relevant time period have led and will continue to lead to claims for payment from the FHA upon their default.

### B.   Citizens Bank Certified That It Complied With HUD Requirements To Gain And Maintain Eligibility In The Direct Endorsement Lender Program

94.     To become and remain a HUD-approved Direct Endorsement Lender, and to receive payment on claims for defaulted FHA-insured loans that it held, Citizens Bank was required to annually certify compliance with HUD's requirements.

24

95.     These certifications were knowingly false because, as discussed below, Citizens Bank knew, deliberately ignored, or recklessly disregarded that it originated and underwrote loans that were not in compliance with HUD requirements.

**C.     Citizens Bank Inflated The Appraised Value Of Certain Homes, Leading To Larger Loans Than Allowed**

96.     Citizens Bank permitted employees to request specific inflated values from appraisers in order to make a loan eligible for FHA insurance.  Such a practice was specifically prohibited by the governing FHA requirements, which forbade lenders from requesting specific valuations from appraisers.  Citizens Bank's processes led to appraisers increasing the appraised value of a property, often with no justification for the increase, and allowed Citizens Bank to maximize its profits by approving more and larger FHA-insured loans than were otherwise approvable.

97.     Citizens Bank's aim was to approve more FHA loans, even if the loans did not meet all of HUD's requirements to qualify for FHA insurance.  As a result of Citizens Bank's deliberate conduct, HUD paid insurance claims on defaulted mortgage loans that Citizens Bank falsely certified as eligible for FHA insurance.

98.     Citizens Bank engaged in a systemic process of inflating the appraised values on FHA loans during the relevant period.  Defendant's process included employees demanding and receiving a higher home appraisal value with no documentation or justification for the increased value of the home or the FHA loan.

99.     As discussed earlier, lenders are responsible for the appraisal's quality, integrity, accuracy and thoroughness.  Mortgagee Letter 1994-54; *see also* HUD Handbook 4000.4, REV-1, CHG-2, ch. 3-3.G; HUD Handbook 4155.2, ch. 4.1.b.  HUD relies on the Direct Endorsement Lender to "review the appraisal to determine whether or not the appraiser's conclusions are acceptable."  HUD Handbook 4000.4, REV-1, CHG-2, ch. 3-3.G.

100.    The appraised value directly affects the risk to FHA as FHA caps the maximum eligible loan amount by setting limits on the LTV ratio, which compares the loan amount to the appraised value.  In order to protect the integrity of the appraisal, FHA rules specifically provide than an appraisal cannot be "based on a requested minimum valuation, a specific valuation or range of values."  *See* Mortgagee Letter 1996-26.  To preserve appraiser independence, FHA rules have continually prohibited lenders such as Citizens Bank from requesting or providing to the appraiser "an anticipated, estimated, encouraged or desired value."  *See* Mortgagee Letter 2009-28.[10]

101.    Citizens Bank requested from appraisers, sometimes through appraisal management companies, a specific inflated value for a home.  This improper request often led to the appraiser increasing the appraised value, and, other than the inflated value, the inflated appraisal often was exactly the same as the original appraisal.

102.    The increase in appraised value sought by Citizens Bank – and granted by appraisers without justification – also occurred on cash-out refinances, where a borrower can obtain a loan for up to 95 percent of the value of their home and receive cash.  This increased the amount of cash back to the borrower and served no other purpose.  By inflating the appraised value, Citizens Bank caused the FHA fund to insure more than 95 percent of the value of a home, which could put the loan immediately "under water" (with a loan larger than the house value) if the value declined even slightly.

103.    Citizens Bank's process of requesting inflated and unsupported appraised values on mortgages insured by the FHA led to Citizens Bank endorsing loans for FHA insurance that it knew were not eligible for FHA insurance.

---

[10] Mortgagee Letter 2009-28 was superseded by HUD Handbook 4000.1 (Mar. 16, 2016).

**D.      Defendant Violated HUD and GSE Requirements For Appraisals And Appraiser
Independence**

104.    As discussed above, HUD requires FHA Direct Endorsement Lenders to conduct proper

due diligence before originating FHA-insured mortgages, which includes obtaining a proper

home appraisal.  The appraisal must meet professional standards and have been obtained through

a process that is independent of a lender's loan processing operation.

105.    Similarly, the GSEs require sellers of mortgage loans to conduct proper appraisals

through a process that is independent of pressure from the loan processing function.

106.    Citizens Bank was aware of these requirements as evidenced by the fact that they were

included in corporate policy manuals during the relevant time period.  However, Citizens Bank

wholly ignored these requirements precisely when they were needed the most – when loan

officers exerted pressure on the appraisal function to increase values in order to "close" deals.

107.    At Citizens Bank, loan officers were paid a small monthly salary and received the

majority of their compensation from commissions based on the dollar amount of funded loans

they generated.[11]

108.    Beginning in 2009, ███████████████ Citizens Bank's Appraisal Review Group

(ARG) was organizationally part of its Credit Risk department, along with the commercial

appraisal review function.

109.    The Appraisal Review Group was responsible for escalated appraisal issues for FHA-

insured mortgages, conforming mortgages that were sold to the GSEs, and all other mortgages

that Citizens Bank either retained on its balance sheet or sold to private parties.  Indeed, Citizens

Bank would often not know at the time a mortgage loan closed whether it would be retained or

sold.

---

[11] Citizens Bank historically paid loan underwriters bonuses for loans approved.

110.     Since 2009, the pressure from the loan processing side to inflate values to promote mortgage originations has grown considerably.[12]

111.     In 2013, the Appraisal Review Group was moved again, this time into the "Home Lending Solutions Group."  This was a business-side group that contained residential mortgage underwriting and loan processing functions as well as loan officers whose primary responsibility was to originate mortgages.

112.     In October 2013, Citizens Bank hired Linda Roddenberry into the position of Appraisal Director, which was in charge of the Appraisal Review Group.

113.     Ms. Roddenberry was previously an underwriter and Vice President-Manager of the Collateral Management System ("CMS") at SunTrust.  Ms. Roddenberry had no prior appraisal experience or training and was without a college degree (which appraisers are required to have). Ms. Roddenberry was at SunTrust during the time its mortgage business operated in violation of FHA requirements, for which SunTrust paid nearly $1 billion to settle claims brought by the Department of Justice and numerous states.[13]

114.     When Ms. Roddenberry joined Citizens Bank she brought along with her some of the employees who had worked for her at SunTrust.

115.     From the outset of her time at Citizens Bank, Ms. Roddenberry was loyal to the Sales side.  She told another senior executive that she would do whatever was necessary to ensure that the sales force would be successful.

---

[12] Sales staff were communicating specific "Requested values" to the Appraisal function as early as 2012.

[13] Press Release, "Federal Government and State Attorneys General Reach Nearly $1 Billion Agreement with SunTrust to Address Mortgage Loan Origination as Well as Servicing and Foreclosure Abuses," U.S. Dept. of Justice (June 17, 2014), available at https://www.justice.gov/opa/pr/federal-government-and-state-attorneys-general-reach-nearly-1-billion-agreement-suntrust (last visited Apr. 22, 2016).

116.     Relator Cote's role at Citizens Bank became marginalized beginning in 2013 with Ms. Roddenberry's arrival.  Beginning in 2014, Mr. Cote and several other prior Appraisal Review Group managers experienced a continuing reduction in their responsibilities.  During Ms. Roddenberry's first few months on the job she hired Cory Murphy, a former associate of hers at SunTrust.  Mr. Murphy's function was to create a new group that would complete the same task as the then-current Appraisal Review Group group, escalated appraisal issues.

117.     Under Mr. Murphy's leadership, Citizens Bank appraisers were required as part of their primary role to speak directly with loan officers about appraisals or appraisers.

118.     With the responsibility for these escalated reviews being transferred to the new Collateral Investigations Group, Mr. Cote's position as Chief of Residential Appraisal was eliminated in October 2014, after Mr. Cote had performed over eleven successful years at Citizens Bank.

119.     Mr. Murphy recently left Citizens Bank, as have at least four other employees in the appraisal function, due to the sales group's improper pressure.

120.     In this manner, under Ms. Roddenberry's direction the appraisal function at Citizens Bank became captive to the sales side and succumbed to consistent pressure from loan officers and other loan processing staff to obtain appraisals at values that would support the making of a given loan.

**1.** ███████████████████████████████

█ ████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

████████████████████████

122.     OCC Bulletin 2010-42 (Dec. 20, 2010) announced that the OCC, along with the Board of
Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office
of Thrift Supervision, and the National Credit Union Administration had adopted the *Interagency
Appraisal and Evaluation Guidelines* ("Interagency Guidelines"), which "describe the elements
of a sound program for conducting appraisals and evaluations and address supervisory matters
related to real estate appraisals and evaluations used to support real estate-related financial
transactions."

123.     The Bulletin continues, "[r]eliable appraisals and evaluations, which national banks use
to determine the market value of collateral for mortgages and other loans, are in integral part of
banks' real estate lending activities …. Banks should have independent programs for obtaining
property values, as well as standards for appropriate communications and information-sharing
with appraisers and people performing evaluations."

124.     Among the appraisal-related requirements in the Interagency Guidelines are that "[a]n
institution's policies and procedures should ensure that it avoids inappropriate actions that would
compromise the independence of the collateral valuation function, including:  Communicating a
predetermined, expected, or qualifying estimate of value, or a loan amount or target loan-to-
value ratio to an appraiser or person performing an evaluation," and "[s]pecifying a minimum

30

value requirement for the property that is needed to approve the loan or as a condition of ordering the valuation."  75 Fed. Reg. at 77457.

125.    In addition, the Interagency Guidelines require that a lender establish an organizational structure that provides independence for the appraisal function:  "The collateral valuation program is an integral component of the credit underwriting process, and, therefore should be isolated from influence by the institution's loan production staff."  *Id.*

126.    The Interagency Guidelines, 75 Fed. Reg.77450, contain an exemption for transactions insured or guaranteed by a U.S. Government Agency or U.S. Government-Sponsored Agency. However, "[t]he Agencies expect these transactions to meet all the underwriting requirements of the Federal insurer or guarantor, including its appraisal requirements, in order to receive the insurance or guarantee."

127.    The Interagency Guidelines similarly contain an exemption for transactions that qualify for sale to a GSE, 75 Fed. Reg. at 77467, but provide that the lender "should have appropriate policies to confirm its compliance with the underwriting and appraisal standards of the U.S. government agency or U.S. government-sponsored agency."  *Id.*

128.    ████████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

129.    ████████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████

31

130. 

131.

132.

133.

134.   The origination of FHA-insured loans is governed by HUD rules that require a similar level of appraiser integrity and independence to the OCC requirements.

135.   The sale of mortgage loans to the GSEs is governed by rules and regulations that also require appraiser integrity and independence.

2.      **Citizens Bank Ignored Its Own Corporate Policy Manual That Required Appraiser Independence**

136.    Citizens Bank well understood the "critical" role played by accurate appraisals in the residential mortgage origination business.  Its Collateral Policy Manual (eff. 1, 2013) states:

> As part of its fundamental commitment to safe and sound lending, RBSCFG (Bank), operating as both Citizens Bank, Charter One Bank and CCO Mortgage, recognizes that the appraisal is a critical component of the loan underwriting or real estate investment decision.  Therefore, for all federally related transactions, the policy of the Bank, its related affiliates and subsidiaries, shall be to ensure that appraisals are performed in accordance with the standards and requirements set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), the Interagency Evaluation and Appraisal Guidelines and Regulation Z, Sec. 226.42 – Valuation Independence; as well as any other supplemental guidelines issued by the Federal Deposit Insurance Corporation (FDIC) and the Office of the Comptroller of the Currency (OCC), including those regarding non-discrimination requirements and fair lending practices.

> These regulations require RBSCFG to maintain appraisal policies to ensure appraisals reflect base level professional competence, negate all direct and indirect interest (financial or otherwise) in the property or transaction, and facilitate reporting of estimates of market value upon which institutions rely to make sound lending decisions.

Citizens Bank Collateral Policy Manual, Introduction, page 1.

137.    In the section titled, "Appraisal Independence Requirements," the Collateral Policy Manual provides:

> RBSCFG will not tolerate any pressure or undue influence of appraisers.  Any instances of coercion, influence, undue pressure, or any form of encouragement for an appraiser to misstate or misrepresent the value of a subject property is strictly prohibited.  The following are examples of practices that are prohibited:
>                  \*\*\*
> Providing an appraiser with an anticipated, estimated, encouraged or desired value for the subject property or a proposed or target amount to be loaned to the borrower….
>                  \*\*\*
> **We prohibit conditions or arrangements that infringe or may appear to infringe upon the appraiser's independence.  We prohibit communications or actions that pressure appraisers with respect to their valuations; such as, suggesting a specific value or suggesting the value should be lower or higher.**

Citizens Bank Collateral Policy Manual, Ch. 1, page 2-3 (emphasis in original).

33

138.    This company policy applies to mortgages sold to the GSEs, and while it does not directly apply to FHA-insured mortgages, the Collateral Policy Manual acknowledges that "FHA has long advised lenders and appraisers of the importance of appraiser independence in the context of generally accepted prudent lending practices."  Citizens Bank Collateral Policy Manual, Ch. 1, page 3.

### 3.    Citizens Bank's Loan Production Function Pressured Its Appraisers To Inflate Home Values

139.    With Ms. Roddenberry leading the Appraisal Review Group, and beholden to the sales team, Citizens Bank's residential appraisal function has been compromised in numerous ways continuing through the present.

140.    In February 2014, Cari Overby, a VP-Product Manager, told Linda Roddenberry that he had received "a lot of requests from the field" to raise the threshold above which Citizens Bank would require two appraisals from $1 million to $1.5 million.  Ms. Roddenberry approved this policy change less than three hours later.

141.    In March 2014, Sean Woods, a Citizens Bank Branch Manager in Massachusetts, escalated an appraisal issue where a customer was "looking for $550000.00 against her property" in a home equity loan but the Appraisal Review Group provided an insufficiently high appraised value.  He pleaded that "This is going to be a HUGE hit for our branch.  This customer HATES BoA, was referred to us by one of my Center of Influence, was going to be moving her entire relationship ( Business/Personal ) to Citizens ( she owns her own realty company in South Boston).  This is going to cost us, Sonia, Dan, and my COI …. This is a nightmare loss if we use this appraisal value."

142.    In and around May 2014, Citizens Bank created a new "Panel Appraiser Solution" for the Washington, D.C. metro area for "CtP" (construction-to-permanent) mortgage loans, with the express purpose to "better support the business in their recruiting and growth aspirations."

143.    This appraiser panel did not work with other loan types, including government loans, but was emblematic of how Citizens Bank violated the law and its own policies when it would require appraisers to "support the business."

144.    

145.    Despite this clear direction, in July 2014, Nancy Moore forwarded to Mr. Cote a list of specific appraisers described as "referrals from [loan] production."  Among the loan production staff referring specific appraisers were Susan Turner and Mike Zell, a Producing Sales Manager from Virginia.

146.    The mechanism Citizens Bank devised ████████████████████████████ ████████████████████████████ was to have loan production staff transmit their recommendations to the operations group, which would then pass it along to the appraisal function (Collateral Risk Management).  Ms. Roddenberry explained this practice in an email that stated she was "trying to accommodate the business line on this very important initiative."

147.    The following month, in August 2014, Mr. Zell emailed a group including Andrew Levy

in the Collateral Management Group to dispute an appraisal for a loan he was trying to sell.  He

told Mr. Levy and others that the "Borrower would like $996,000 which is what they are

receiving from George Mason Mortgage [a competitor] however the appraised value at 80%

needs to be $1.245,500.00."

148.    In response to Mr. Zell's communication, Mr. Levy responded that "we did go back to

the appraiser that completed the original Citizens appraisal with the additional comps.  The

appraiser revised the value on the report from $1,025,000 to $1,150,000."

149.    Mr. Zell was not satisfied by this increase and voiced his displeasure in an email to

numerous individuals in the appraisal group, explaining that appraisers would often increase

their values when he submits additional comparable sales ("comps"):

> I also find it EXTREMELY DISTURBING and actually quite a head scratcher
> that ARG typically has agreed to all initial values submitted by the appraisers on
> my loans since I have been here, yes some were quite low, and when I submitted
> comps that eventually raised the value on the appraisals ARG agreed with the
> increased values based on comps supplied by me.  Something is seriously amiss
> here as I do not believe ARG has access to any market materials or MRIS in the
> markets we serve, will not contact builders or Realtors for additional explanations
> or comps on value thus **making decisions in a vacuum simply off of what is**
> **supplied by the initial appraiser and later the Loan Officer.  This is clear**
> **evidence the process is broken as it exists here**.
>
> ***
>
> **Loan Officers are NOT appraisers but it is painfully obvious we must wear**
> **the hat of an appraiser and do their work as well as ours to even have a**
> **chance to survive here at Charter One**.[24]

---

[24] Charter One was the brand name for a commercial bank that was acquired by Citizens
Bank in 2004.

150.    In September 2014, an appraisal for a new loan was flagged by Mr. Murphy for an Appraisal Independence Requirement (AIR) violation because the borrower's prequalification letter (with the intended sales price) was given to the appraiser.  A second appraisal was ordered.

151.    However, Ms. Roddenberry directed that the AIR violation be rescinded and that the first appraisal be used, but that the bank should find other comparable sales that could result in a higher appraised value.

152.    When inconsistencies arose with the first appraiser's work, a second appraisal was (again) ordered.

153.    The second appraisal was found by the appraisal group to be "worse than the first" and "deemed defective."  Ms. Roddenberry then "authorized a onetime exception in this case to use the initial appraisal that was previously deemed defective **due to the noted time constraints with the customer[']s anticipated closing**."  (emphasis added.)

154.    The appraisal group expressed regret that even when using a defective appraisal, it "was falling short of the desired value," but hoped that a new process being put in place would "provide the results we are seeking from both sides of the house," *i.e.*, the appraisal and loan production functions.

**E.    Citizens Bank Submitted And Caused To Be Submitted False Claims For Payment To HUD and the GSEs**

155.    The violations of appraisal-related laws and regulations discussed in this complaint are representative examples of Citizens Bank's conduct that led it to knowingly submit or cause to be submitted false claims to HUD.  The loans are emblematic of the loans defendant falsely certified for FHA insurance and are products of the systemic practices and procedures followed by defendant that led to the submission of false statements and claims.

156.    HUD paid claims that were false because the loans were not eligible for FHA insurance, and defendant falsely certified to the integrity of the data that was used to approve the loan for FHA insurance and its compliance with HUD requirements (for loans approved through the use of an AUS), or falsely certified that the loan was underwritten using due diligence in accordance with HUD guidelines (for manually-underwritten loans).

157.    Defendant falsely certified that the statements made in the application for insurance were true and accurate and that all conditions had been satisfied.  The mortgages did not qualify for FHA insurance because they were not underwritten in accordance with HUD guidelines, defendant had not used due diligence in underwriting them, defendant entered data into the AUS that lacked integrity, and/or defendant failed to satisfy the AUS conditions before closing and endorsing the mortgages for FHA insurance.

158.    Defendant violated HUD requirements and falsely certified to compliance with those requirements.  defendant was therefore not authorized to endorse these mortgage loans for FHA insurance.  Defendant's false certifications and violations of HUD requirements bore upon the likelihood of whether the borrower would make mortgage payments.

159.    The violations of appraisal-related laws and regulations discussed herein similarly illustrate the illegal conduct by which Citizens Bank knowingly submitted or caused to be submitted false claims for payment to the GSEs.

160.    Citizens Bank caused the GSEs to pay for mortgage loans that were not originated in compliance with its express requirements for appraisals and appraisal independence.

161.    Accordingly, Citizens Bank caused the GSEs to pay money that they would not have paid had they known that the mortgages they were purchasing did not comply with their requirements.

In addition to the financial harm arising from the GSEs' purchase of mortgage loans that they would not otherwise have purchased (at the purchase price, or at all), the GSEs are also harmed by having guaranteed mortgage loans that are at a higher risk of default now and in the future.

## VIII.   COUNTS

### COUNT I:  FALSE OR FRAUDULENT CLAIMS
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**

162.    Relators repeat and re-allege paragraphs 1-161 as if fully set forth herein.

163.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

164.    Such actions were done knowingly, as that term is defined in 31 U.S.C. § 3729(b)(1).

165.    Because of defendant's acts, the United States has sustained damages in an amount to be determined at trial and therefore is entitled to treble damages under the False Claims Act plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### COUNT II:  FALSE STATEMENTS
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

166.    Relators repeat and re-allege paragraphs 1-161 as if fully set forth herein.

167.    Defendant knowingly made or used, or caused to be made or used a false record or statement material to a false or fraudulent claim in violation of the False Claims Act,

31 U.S.C. § 3729(a)(1)(B).

168.    Such actions were done knowingly, as that term is defined in 31 U.S.C. § 3729(b)(1).

169.    Because of defendant's acts, the United States has sustained damages in an amount to be determined at trial and therefore is entitled to treble damages under the False Claims Act plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## COUNT III:  REVERSE FALSE CLAIMS
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

170.    Relators repeat and re-allege paragraphs 1-161 as if fully set forth herein.

171.    Defendant knowingly made or used, or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

172.    Such false records or statements or concealment, avoidance or decrease of an obligation to pay or transmit money to the United States were made or done knowingly, as defined in 31 U.S.C. § 3729(b)(1).

173.    Because of defendant's acts, the United States has sustained damages in an amount to be determined at trial and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Relators Kenneth Cote and John Ferguson respectfully request that this Honorable Court enter judgment in their favor and in favor of the United States of America and against defendant Citizens Bank as follows:

A.  For the United States, treble damages and civil penalties of not less than $5,500 nor more than $11,000 per false claim pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1);

B.  For pre-judgment interest on all damages awarded;

C.  For any and all reasonable costs, expenses and attorneys' fees;

D.  For an award to Relators in the maximum amount permissible under law; and

E.  For such other and further relief as the Court deems just and equitable.

## IX.   DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

April 26, 2016

Respectfully submitted,

Michael Eisenkraft
Cohen Milstein Sellers & Toll PLLC
88 Pine Street
14th Floor
New York, NY 10005
Telephone:  (212) 838-7797
Fax:  (212) 838-7745
meisenkraft@cohenmilstein.com

Gary L. Azorsky
Jeanne A. Markey
Raymond M. Sarola
Cohen Milstein Sellers & Toll PLLC
3 Logan Square, 1717 Arch Street
Suite 3610
Philadelphia, PA 19103
Telephone:  (267) 479-5700
Fax:  (267) 479-5701
gazorsky@cohenmilstein.com
jmarkey@cohenmilstein.com
rsarola@cohenmilstein.com

*Attorneys for Relators*